Citation Nr: 1104830 
Decision Date: 02/07/11 Archive Date: 02/14/11

DOCKET NO. 09-26 669 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Pittsburgh, 
Pennsylvania

THE ISSUES

1. Entitlement to an evaluation in excess of 50 percent for 
posttraumatic stress disorder ("PTSD").

2. Entitlement to service connection for post-operative 
residuals of ulcerative colitis, to include as secondary to PTSD.

3. Entitlement to a total disability rating for compensation 
based on individual unemployability ("TDIU").

REPRESENTATION

Appellant represented by: Disabled American Veterans

WITNESSES AT HEARINGS ON APPEAL

Appellant and spouse
ATTORNEY FOR THE BOARD

T. Y. Hawkins, Associate Counsel

INTRODUCTION

The Veteran served on active duty from April 1969 to January 
1972.

These matters come before the Board of Veterans' Appeals 
("Board") on appeal from rating decisions issued by the 
Department of Veterans Affairs ("VA") Regional Office ("RO") 
in Pittsburgh, Pennsylvania. In an April 2007 rating decision, 
the RO denied the Veteran's claims of entitlement to service 
connection for post-operative residuals of ulcerative colitis, to 
include as secondary to PTSD, and TDIU. In an August 2008 rating 
decision, the RO denied the Veteran's claim of entitlement to an 
evaluation in excess of 50 percent for PTSD. 

In April 2009, the Veteran appeared at a hearing before a 
Decision Review Officer at the Pittsburgh RO. A transcript of 
the hearing has been associated with the Veteran's claims folder. 

In March 2010, the Veteran appeared at a Travel Board hearing 
before the undersigned Veterans Law Judge at the Pittsburgh RO. 
A transcript of the hearing has been associated with the 
Veteran's claims folder. 
 
The record reflects that the Veteran has submitted additional 
evidence to the Board in conjunction with this case, accompanied 
by a waiver of initial review of this evidence by the Agency of 
Original Jurisdiction ("AOJ") in accordance with 38 C.F.R. 
§ 20.1304 (2010).

The issue of entitlement to TDIU is addressed in the REMAND 
portion of the decision below and is REMANDED to the RO via the 
Appeals Management Center ("AMC") in Washington, DC. The 
Veteran will be notified if additional action is necessary on his 
part.
The issue of entitlement to service connection for renal 
failure, to include as secondary to post-operative 
residuals of ulcerative colitis, has been raised by the 
record, but has not been adjudicated by the AOJ. 
Therefore, the Board does not have jurisdiction over it, 
and it is referred to the AOJ for appropriate action. 

FINDINGS OF FACT

1. Throughout the course of this appeal, the Veteran's PTSD has 
been manifested by depression; intrusive thoughts; anger and 
irritability; impairment of short-term memory; emotional 
avoidance and numbing; occasional suicidal ideation; anxiety; 
occasional panic attacks; impaired judgment; difficulty in 
establishing and maintaining effective work and social 
relationships; and difficulty adapting to stressful circumstances 
(including work or a worklike setting). 

2. Exacerbations of the Veteran's post-operative residuals of 
ulcerative colitis have been medically-attributed to his service-
connected PTSD.

CONCLUSIONS OF LAW

1. The criteria for an evaluation in excess of 50 percent 
disabling for PTSD have not been met. 38 U.S.C.A. §§ 1155, 5107 
(West 2002 & Supp. 2010); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1, 
4.27, 4.126, 4.130, Diagnostic Code 9411 (2010).

2. The evidence of record establishes that the Veteran's current 
post-operative residuals of ulcerative colitis are secondarily 
aggravated by his service-connected PTSD. 38 U.S.C.A. §§ 1110, 
5103, 5103A, 5107 (West 2002 & Supp. 2010); 38 C.F.R. §§ 3.102, 
3.159, 3.303(c), 3.304, 3.306, 3.310 (2010). 

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Veterans Claims Assistance Act of 2000 ("VCAA")

With respect to the Veteran's claims decided herein, VA has met 
all statutory and regulatory notice and duty to assist 
provisions. See 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 
5107, 5126 (West 2002 & Supp. 2010); 38 C.F.R. §§ 3.102, 
3.156(a), 3.159, 3.326 (2010). 

a.) Duty to Notify

Under the VCAA, when VA receives a complete or substantially 
complete application for benefits, it is required to notify the 
claimant and his or her representative, if any, of any 
information and medical or lay evidence that is necessary to 
substantiate the claim. 38 U.S.C.A. § 5103(a) (West 2002); 38 
C.F.R. § 3.159(b) (2010); Quartuccio v. Principi, 16 Vet. App. 
183 (2002). In Pelegrini v. Principi, 18 Vet. App. 112, 120-21 
(2004) ("Pelegrini II"), the United States Court of Appeals for 
Veterans Claims (Court) held that VA must inform the claimant of 
any information and evidence not of record (1) that is necessary 
to substantiate the claim; (2) that VA will seek to provide; (3) 
that the claimant is expected to provide; and (4) request that 
the claimant provide any evidence in his or her possession that 
pertains to the claim. Element (4), the requirement of 
requesting that the claimant provide any evidence in his 
possession that pertains to the claim, was eliminated by the 
Secretary during the course of this appeal. See 73 Fed. Reg. 
23353 (final rule eliminating fourth element notice as required 
under Pelegrini, effective May 30, 2008). Thus, any error 
related to this element is harmless.

The requirements apply to all five elements of a service 
connection claim: (1) veteran status; (2) existence of a 
disability; (3) a connection between the veteran's service and 
the disability; (4) degree of disability; and (5) effective date 
of the disability. See Dingess/Hartman v. Nicholson, 19 Vet. 
App. 473 (2006), aff'd, Hartman v. Nicholson, 483 F.3d 1311 (Fed. 
Cir. 2007).

In this case, VA essentially satisfied the notification 
requirements of the VCAA by means of letters dated December 2006 
and February 2007 (which informed the Veteran of the types of 
evidence needed in order to substantiate his claim of entitlement 
to service connection for post-operative residuals of colitis, to 
include as secondary to an already service-connected disability, 
as well as the division of responsibility between him and VA for 
obtaining the required evidence). See
38 U.S.C.A. §5103(a); 38 C.F.R. § 3.159(b). 

With regard to the Veteran's claim of entitlement to an increased 
evaluation for PTSD, in this case, service connection has already 
been established, and the current appeal arose from a claim for 
an increased rating. In a letter dated September 2008, the 
Veteran was advised of the specific rating criteria for 
establishing an increased disability rating for PTSD, and was 
informed that he should provide evidence showing that his 
disability had increased in severity. This letter also advised 
him of what VA would do to assist him in obtaining evidence, 
including the specific types of evidence, both lay and medical, 
that could be submitted in support of a claim for an increased 
rating, as well as the specific rating criteria for PTSD. 

The December 2006 and February 2007 letters also informed the 
Veteran of how VA assigns the effective date and disability 
rating elements of a claim. See Dingess/Hartman, supra. 

 b.) Duty to Assist

The Board also concludes VA's duty to assist has been satisfied. 
The claims file contains the Veteran's service and post-service 
treatment records, and VA PTSD and ulcerative colitis 
examinations dated February 2007, March 2008 and May 2009, 
respectively. The claims folder also contains the Veteran's 
statements in support of his claims. The Veteran has not 
referenced any outstanding records that he wanted VA to obtain or 
that he felt were relevant to his claims that have not already 
been obtained and added to the record.

With regard to the examination reports, the Board notes that they 
show that the examiners reviewed the Veteran's relevant treatment 
reports, including his service and post-service treatment 
records, elicited from the Veteran his history of complaints and 
symptoms, and provided clinical findings detailing the results of 
the examination findings. For these reasons, the Board concludes 
that the examination reports are adequate upon which to make a 
decision in this case.

The Board also notes that the Veteran has reported that he has 
received, and/or is still receiving, Social Security Disability 
Insurance benefits from the Social Security Administration 
("SSA"), and these reports are of record. Review of these 
reports shows that the Veteran is receiving SSA disability 
benefits for refractory ulcerative colitis. As these records are 
clearly pertinent to the Veteran's claim of service connection 
for post-operative ulcerative colitis, they have been carefully 
reviewed.

In short, the Board has carefully considered the provisions of 
the VCAA in light of the record on appeal, and for the reasons 
expressed above finds that the development of the claims has been 
consistent with the provisions of the VCAA. The appellant has 
been provided with every opportunity to submit evidence and 
argument in support of his claims, and to respond to the VCAA 
notice. The purpose behind the notice requirement has been 
satisfied because the appellant has been afforded a meaningful 
opportunity to participate effectively in the processing of his 
appealed claims. Accordingly, the Board will proceed to a 
decision on the merits.

II. Analysis

The Board has thoroughly reviewed all of the evidence in the 
Veteran's claims folder. Although the Board has an obligation to 
provide reasons and bases supporting this decision, there is no 
need to discuss, in detail, the evidence submitted by the Veteran 
or on his behalf. See Gonzales v. West, 218 F.3d 1378, 1380-81 
(Fed. Cir. 2000) (the Board must review the entire record, but 
does not have to discuss each piece of evidence). The analysis 
below focuses on the most salient and relevant evidence and on 
what this evidence shows, or fails to show, on the claims. The 
Veteran must not assume that the Board has overlooked pieces of 
evidence that are not explicitly discussed herein. See 
Timberlake v. Gober, 14 Vet. App. 122 (2000) (the law requires 
only that the Board address its reasons for rejecting evidence 
favorable to the Veteran).

The Board must assess the credibility and weight of all evidence, 
including the medical evidence, to determine its probative value, 
accounting for evidence which it finds to be persuasive or 
unpersuasive, and providing reasons for rejecting any evidence 
favorable to the claimant. Equal weight is not accorded to each 
piece of evidence contained in the record; every item of evidence 
does not have the same probative value. When all the evidence is 
assembled, VA is responsible for determining whether the evidence 
supports the claim or is in relative equipoise, with the Veteran 
prevailing in either event, or whether a preponderance of the 
evidence is against the claim, in which case, the claim is 
denied. See Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

Under 38 U.S.C.A. § 1154(a), VA is also required to give "due 
consideration" to "all pertinent medical and lay evidence" in 
evaluating a claim for disability or death benefits. In Jandreau 
v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007), the United 
States Court of Appeals for the Federal Circuit ("Federal 
Circuit") held that "[l]ay evidence can be competent and 
sufficient to establish a diagnosis of a condition when (1) a 
layperson is competent to identify the medical condition, (2) the 
layperson is reporting a contemporaneous medical diagnosis, or 
(3), lay testimony describing symptoms at the time supports a 
later diagnosis by a medical professional." (footnote omitted). 
However, the Court has held that "[t]he type of evidence that 
will suffice to demonstrate entitlement to service connection, 
and the determination of whether lay evidence may be competent to 
satisfy any necessary evidentiary hurdles, depends on the type of 
disability claimed." Barr v. Nicholson, 21 Vet. App. 303, 308 
(2007).

When there is an approximate balance of positive and negative 
evidence regarding any issue material to the determination of a 
matter, the benefit of the doubt shall be given to the claimant. 
38 U.S.C.A. § 5107(b). When a reasonable doubt arises regarding 
service origin, such doubt will be resolved in the favor of the 
claimant. Reasonable doubt is doubt which exists because of an 
approximate balance of positive and negative evidence which does 
not satisfactorily prove or disprove the claim. 38 C.F.R. § 
3.102. The question is whether the evidence supports the claim or 
is in relative equipoise, with the claimant prevailing in either 
event, or whether a fair preponderance of the evidence is against 
the claim, in which event the claim must be denied. See Gilbert, 
1 Vet. App. at 54.

In order to establish a right to compensation for a present 
disability, a claimant must show: "(1) the existence of a 
present disability; (2) the in-service incurrence or aggravation 
of a disease or injury; and (3) a causal relationship between the 
present disability and the disease or injury incurred or 
aggravated during service"- the so-called "nexus" 
requirement. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 
2004). 

Alternatively, under 38 C.F.R. § 3.303(b), service connection may 
be awarded for a "chronic" condition when (1) a chronic disease 
manifests itself and is identified as such in service, or within 
the presumptive period under 38 C.F.R. § 3.307, and the veteran 
presently has the same condition; or (2) a disease manifests 
itself during service, or during the presumptive period, but is 
not identified until later, and there is a showing of continuity 
of related symptomatology after discharge, and medical evidence 
relates that symptomatology to the Veteran's present condition. 
Savage v. Gober, 10 Vet. App. 488, 495-98 (1997).

A. Entitlement to an evaluation in excess of 50 percent for 
PTSD.

Disability evaluations are determined by evaluating the extent to 
which a Veteran's service-connected disability adversely affects 
his or her ability to function under the ordinary conditions of 
daily life, including employment, and by comparing his or her 
symptomatology with the criteria set forth in the Schedule for 
Rating Disabilities. The percentage ratings represent as far as 
can practicably be determined, the average impairment in earning 
capacity resulting from such diseases and injuries, and the 
residual conditions in civilian occupations. Generally, the 
degrees of disability specified are considered adequate to 
compensate for considerable loss of working time from 
exacerbation or illness proportionate to the severity of the 
several grades of disability. 38 U.S.C.A. § 1155 (West 2002); 
38 C.F.R. § 4.1 (2010). Separate Diagnostic Codes ("DCs") 
identify the various disabilities and the criteria for specific 
ratings. Any reasonable doubt regarding the degree of disability 
will be resolved in favor of the Veteran. 38 C.F.R. § 4.3 
(2010).

The Veteran's entire history is reviewed when making a disability 
determination. See 38 C.F.R. § 4.1 (2010). Where service 
connection has already been established, and increase in the 
disability rating is at issue, it is the present level of the 
disability that is of primary concern. See Francisco v. Brown, 7 
Vet. App. 55 (1994). However, in Fenderson v. West, 12 Vet. App. 
119 (1999), it was held that evidence to be considered in the 
appeal of an initial assignment of a disability rating was not 
limited to that reflecting the then current severity of the 
disorder. The Court also discussed the concept of the 
"staging" of ratings, finding that, in cases where an initially 
assigned disability evaluation has been disagreed with, it was 
possible for a veteran to be awarded separate percentage 
evaluations for separate periods based on the facts found during 
the appeal period. See also Hart v. Mansfield, 21 Vet. App. 505 
(2009).

The evaluation of the same disability under various diagnoses, 
known as pyramiding, is generally to be avoided. 38 C.F.R. § 
4.14 (2010). The critical element in permitting the assignment 
of several ratings under various diagnostic codes is that none of 
the symptomatology for any one of the disabilities is duplicative 
or overlapping with the symptomatology of the other disability. 
 See Esteban v. Brown, 6 Vet. App. 259, 261-62 (1994).

Where there is a question as to which of two ratings shall be 
applied, the higher rating will be assigned if the disability 
picture more nearly approximates the criteria required for that 
rating. Otherwise, the lower rating will be assigned. 38 C.F.R. 
§ 4.7 (2010).

When evaluating a mental disorder, the rating agency shall 
consider the frequency, severity, and duration of psychiatric 
symptoms, the length of remissions, and the veteran's capacity 
for adjustment during periods of remission. The rating agency 
shall assign an evaluation based on all the evidence of record 
that bears on occupational and social impairment rather than 
solely on the examiner's assessment of the level of disability at 
the moment of the examination. Although the rating agency will 
consider the extent of social impairment, it shall not assign an 
evaluation solely on the basis of social impairment. 38 C.F.R. § 
4.126 (2010).

The Veteran's service-connected PTSD is evaluated under DC 9411. 
The regulations establish a general rating formula for mental 
disabilities. See 38 C.F.R. § 4.130 (2010). Ratings are 
assigned according to the manifestation of particular symptoms. 
However, the use of the term "such as" in 38 C.F.R. § 4.130 
demonstrates that the symptoms after that phrase are not intended 
to constitute an exhaustive list, but rather are to serve as 
examples of the type and degree of the symptoms, or their 
effects, that would justify a particular rating. See Mauerhan v. 
Principi, 16 Vet. App. 436 (2002). Accordingly, the evidence 
considered in determining the level of impairment under § 4.130 
is not restricted to the symptoms provided in the diagnostic 
code. Instead, VA must consider all symptoms of a claimant's 
disability that affect the level of occupational and social 
impairment, including, if applicable, those identified in the 
American Psychiatric Association: Diagnostic and Statistical 
Manual of Mental Disorders (4th ed. 1994) ("DSM-IV").

The criteria for the current 50 percent rating are:

Occupational and social impairment with 
reduced reliability and productivity due to 
such symptoms as: flattened affect; 
circumstantial, circumlocutory, or 
stereotyped speech; panic attacks more than 
once a week; difficulty in understanding 
complex commands; impairment of short and 
long-term memory (e.g., retention of only 
highly learned material, forgetting to 
complete tasks); impaired judgment; impaired 
abstract thinking; disturbances of motivation 
and mood; difficulty in establishing and 
maintaining effective work and social 
relationships.

The criteria for a 70 percent rating are:

Occupational and social impairment, with 
deficiencies in most areas, such as work, 
school, family relations, judgment, thinking, 
or mood, due to such symptoms as: suicidal 
ideation; obsessional rituals which interfere 
with routine activities; speech 
intermittently illogical, obscure, or 
irrelevant; near-continuous panic or 
depression affecting the ability to function 
independently, appropriately and effectively; 
impaired impulse control (such as unprovoked 
irritability with periods of violence); 
spatial disorientation; neglect of personal 
appearance and hygiene; difficulty in 
adapting to stressful circumstances 
(including work or a worklike setting); 
inability to establish and maintain effective 
relationships.

And, the criteria for a 100 percent rating are:

Total occupational and social impairment, due 
to such symptoms as: gross impairment in 
thought processes or communication; 
persistent delusions or hallucinations; 
grossly inappropriate behavior; persistent 
danger of hurting self or others; 
intermittent inability to perform activities 
of daily living (including maintenance of 
minimal personal hygiene); disorientation to 
time or place; memory loss for names of close 
relatives, own occupation, or own name.

See 38 C.F.R. § 4.130, Diagnostic Code 9411 (2010).

The Board must consider the Global Assessment of Functioning 
("GAF") scores that have been reported. GAF scores are a scale 
reflecting the "psychological, social, and occupational 
functioning on a hypothetical continuum of mental health- 
illness." See Carpenter v. Brown, 8 Vet. App. 240, 242 (1995); 
see also Richard v. Brown, 9 Vet. App. 266, 267 (1996) (citing 
the DSM-IV, p.32).

GAF scores from 61 to 70 represent some mild symptoms or some 
difficulty in social, occupational, or school functioning, but 
generally functioning pretty well, with some meaningful personal 
relationships. GAF scores from 51 to 60 represent moderate 
symptoms, such as flat affect and circumstantial speech, and 
occasional panic attacks, or moderate difficulty in social, 
occupational, or school function (such as few friends, conflicts 
with peers or co-workers). GAF scores ranging from 41 to 50 
reflect serious symptoms (e.g., suicidal ideation, severe 
obsessional rituals, frequent shoplifting) or any serious 
impairment in social, occupational or school functioning (e.g., 
no friends, unable to keep a job). 

Additionally, scores ranging from 31 to 40 reflect some 
impairment in reality testing or communication (e.g., speech is 
at times illogical, obscure, or irrelevant) or major impairment 
in several areas, such as work or school, family relations, 
judgment, thinking, or mood (e.g., depressed man avoids friends, 
neglects family, and is unable to work; child frequently beats up 
other children, is defiant at home, and is failing at school). A 
score from 21 to 30 is indicative of behavior which is 
considerably influenced by delusions or hallucinations or serious 
impairment in communication or judgment or inability to function 
in almost all areas. A score of 11 to 20 denotes some danger of 
hurting one's self or others (e.g., suicide attempts without 
clear expectation of death; frequently violent; manic excitement) 
or occasionally fails to maintain minimal personal hygiene (e.g., 
smears feces) or gross impairment in communication (e. g., 
largely incoherent or mute). A GAF score of 1 to 10 is assigned 
when the person is in persistent danger of severely hurting self 
or others (recurrent violence) or there is persistent inability 
to maintain minimal personal hygiene or serious suicidal acts 
with clear expectation of death. See 38 C.F.R. § 4.130 
(incorporating by reference VA's adoption of the DSM-IV, for 
rating purposes).

The Veteran contends that the symptoms of his service-connected 
PTSD have worsened and are of greater severity than the current 
50 percent rating contemplates. Having reviewed the complete 
record, and for the reasons and bases set forth below, the Board 
concludes that the greater weight of probative evidence is 
against granting the Veteran's request. In reaching this 
conclusion, the Board has considered the pertinent symptomatology 
shown on the multiple evaluations completed during the current 
appeal, including complaints and/or findings of depression; 
intrusive thoughts; anger and irritability; impairment of short-
term memory; emotional avoidance and numbing; occasional suicidal 
ideation; anxiety; occasional panic attacks; impaired judgment; 
difficulty in establishing and maintaining effective work and 
social relationships; and difficulty adapting to stressful 
circumstances (including work or a worklike setting). 

A review of the claims folder shows that, beginning in January 
2007, the Veteran received individual psychotherapy from social 
worker, G.L.M., at the Altoona, Pennsylvania VA Medical Center 
("VAMC"), as well as psychiatric treatment from Dr. J.S.S. 
Reports from the psychotherapy sessions show that he was 
diagnosed with PTSD and anxiety disorder, NOS (not otherwise 
specified). He reported that he noticed a reduction in stressors 
after undergoing surgery for colitis in early 2007, and stated 
that one of his goals was to be more caring and tolerant, 
especially in his sometimes volatile relationship with his wife. 
He also reported that he was building a new home, which he 
perceived to be a productive project. Treatment notes from Dr. 
J.S.S. reveal that the Veteran had a history of PTSD and panic 
disorder, depression, intermittent explosive disorder and 
narcissistic traits. During a March 2007 evaluation, it was 
noted that he was "emphatic and animated as usual." During a 
July 2007 session, he was observed as demonstrating his 
"customary self confidence." In January 2008, although it was 
noted that he was estranged from most of his children, the 
Veteran did note that he spoke with his daughter in Florida. 

In March 2008, pursuant to his claim of entitlement to an 
increased evaluation for PTSD, the Veteran was afforded a VA PTSD 
evaluation. During the interview portion of the examination, he 
told the clinician that he was taking several psychotropic 
medications, which he felt seemed to help with his symptoms. He 
noted that he had stopped working in 2004, not due to PTSD, but 
due to problems with his colitis and resulting colostomy. 
Socially, he said that he had been married to his current wife 
for 14 years, and was married to his first wife for 17 years. 
However, he said that he had no friends, and although he had 
tried joining the local Vietnam Veterans group, he could not 
tolerate the meetings and could not get along with the other 
veterans, whom he found to be too annoying. His leisure time 
activities were limited to construction of his new home. He 
denied any previous suicide attempts. 

During the mental status examination, it was noted that he was 
appropriately dressed and groomed; however, his clothing was very 
disheveled and dirty. He was alert and oriented in all three 
spheres, cooperative and related appropriately with the examiner. 
His affect was appropriate and matched his self-reported mood. 
He demonstrated a normal rate and flow of speech, with good 
coherence and logic, and neither reported nor demonstrated any 
signs or symptoms of delusions or hallucinations, as he behaved 
appropriately throughout the evaluation. Although he admitted to 
suicidal and homicidal thoughts and ideations, he denied any 
current plans or intent. The examiner commented that the Veteran 
showed some difficulty in his ability to maintain minimal 
personal hygiene and other basic activities of daily living, as 
he was well-covered in mud on both his shoes and pants at the 
time of the evaluation. Regarding his self-reported PTSD 
symptoms, he admitted to short-term memory loss, made worse since 
his heart attack, becoming angry when in large, crowded 
environments, described difficulties with depression and anxiety, 
and difficulty with impaired impulse control, although he denied 
a history of violence or assaultiveness. However, he said that 
he had no sleep problems. He was diagnosed with chronic PTSD, 
and the assigned GAF score was 50, reflective of serious 
symptoms, such as suicidal ideation, severe obsessional rituals, 
or any serious impairment in social, occupational or school 
functioning (e.g., no friends, unable to keep a job). Regarding 
the GAF score, the examiner, who noted that he had performed the 
previous PTSD assessment in 2005, said that he did not feel that 
the Veteran's PTSD symptomatology had changed much since his 
initial evaluation to determine service connection, and that he 
continued to function at a score of 50. With regard to the 
effect of the Veteran's PTSD on his occupational and social 
functioning, although the Veteran asserted that he was unable to 
work secondary to his PTSD symptoms, primarily difficulties with 
anger, the examiner voiced neither agreement, nor disagreement. 
The examiner did note, however, that it was clear that his social 
functioning had been compromised, as he was quite restricted in 
his social interactions. 

The claims folder shows that, following the March 2008 VA 
examination, the Veteran continued receiving PTSD treatment at 
the VAMC. During a May 2008 psychiatric evaluation, he reported 
that his major stressor continued to be overseeing the 
construction of his new house. However, he stressed that he was 
taking steps to cope with the demands, list his priorities, and 
stay focused, which he said helped with his PTSD symptoms. He 
also said that he felt his medication was helping him to maintain 
stability. In this respect, he noted that he was now better able 
to diffuse the conflicts with his wife and work out reasonable 
solutions. 

In August 2008, he told his psychiatrist that he had no 
complaints of substance. He noted that he and his wife had now 
moved into their new home and had put a year's worth of labor 
into the project. He said that he felt that "his emotional 
stability is good overall," but believed that he just had a lot 
of difficult people to deal with. He further noted that his wife 
was difficult to deal with, and that many of his in-laws were 
troublesome. During the mental status examination, he was noted 
to be in "good spirits." Dr. J.S.S. also discussed with the 
Veteran the possibility that he had attention deficit disorder, 
as the Veteran remarked that he was still unable to just sit 
quietly and read. Among the diagnoses was a history of PTSD 
symptoms, a history of depression, intermittent explosive 
disorder, chronic fatigue and narcissistic personality traits. 
There was no assigned GAF score. In September 2008, the Veteran 
told Dr. J.S.S. that he was "very vexed" by VA's failure to 
recognize his claimed increase in PTSD symptomatology. He noted 
that he found interpersonal relationships annoying, and, despite 
his claims that he would be unemployable as a result of his PTSD, 
in a subsequent July 2009 statement, the Veteran admitted that he 
was working part time as a courier, a job that he was able to 
perform because he had no direct contact with others. 

During a November 2009 evaluation, the Veteran's wife joined him 
for his psychiatric appointment. She stated her belief that 
there had been a significant personality change since he 
sustained a cardiac arrest, suggesting a possible brain 
dysfunction. The Veteran admitted that he was easily distracted, 
and his wife said that his memory for appointments and family 
occasions was very poor. Dr. J.S.S. opined that, although these 
symptoms could be partially attributable to depression, the fact 
that the Veteran's mood was good made it more likely that the 
diagnosis was cognitive disorder due to cardiac arrest. 

In January 2009, the Veteran was seen by M.E.S., a licensed 
clinical social worker, for cue exposure therapy treatment due to 
his doctor's believe that some oxygen deprivation during his 
cardiac arrest had resulted in some cognitive difficulties. 
Although he complained about continuing conflicts with his wife, 
his reported mood was good, as he said that "things are going 
alright," but complained that the "authority in the hands of 
idiots really irritate[s] him." His thought content was normal 
with no evidence of psychosis, his hygiene was fair, and his eye 
contact was good. The diagnosis was dysthymic disorder. 

During a March 2009 session with his social worker, the Veteran 
reported that he had finally completed work on one of his homes 
that he planned to put up for sale; the clinician noted that 
another one of his stressors was about to be eliminated. 
However, the Veteran continued to focus on his concern about 
irritation and expressing anger, which he was trying to suppress. 
He agreed to keep a log of events that triggered an emotional 
reaction.

In May 2009, the Veteran was afforded a second VA PTSD 
examination. During the evaluation (which was also attended by 
his wife), the Veteran stated that the frequency of his symptoms 
had become daily and had increased in severity. He now reported 
that his psychotropic medications did not completely resolve his 
irritability, but appeared to cut it down by half. Although the 
Veteran said that he engaged in no leisure activities, the 
therapist noted that, due to the sense of enjoyment that his 
courier driving job provided, it could more readily be described 
as a leisurely pursuit. During the mental status examination, 
the Veteran was found to be appropriately dressed and groomed 
with nothing unusual noted about his appearance. He was oriented 
to all spheres, with a flat affect that continued throughout the 
interview, and was consistent with his reported mood. He denied 
any current suicidal or homicidal ideations, although he admitted 
to having experienced them in the past. He also identified 
short-term memory loss, and his wife said that he experienced 
intrusive thoughts. The examiner noted that the Veteran 
continued to exhibit behavioral, cognitive, social, affective and 
somatic symptoms attributable to PTSD, including intrusive and 
unwanted thoughts of Vietnam, emotional avoidance and numbing, 
irritability and difficulty controlling anger, and 
disillusionment and demoralization. He was diagnosed with 
chronic PTSD, and his assigned GAF score was 45, which, as noted 
above, generally denotes serious symptoms. Regarding the effect 
his PTSD symptoms had on his occupational and social functioning, 
the examiner stated again that his part-time courier job was more 
of a leisure time activity rather than a true vocation, as she 
noted that it provided him a distraction from the more difficult 
tasks of being emotionally present for his family and others, and 
noted that his anger was not provoked, as he had little or no 
social interaction. She opined that full-time gainful employment 
would be unlikely secondary to his PTSD. 

In addition to the medical evidence, the Board has also 
considered the Veteran's testimony during his April 2009 hearing 
before the Board. At that time, he reported that he was on 
several medications for depression and anger and that his current 
PTSD symptomatology consisted of anxiety and panic attacks, 
irritation and anger, very poor short-term memory and occasional 
suicidal ideation. He denied having any trouble sleeping and did 
not recall experiencing nightmares. He also said that, despite 
having problems with anger, he had never been physically violent. 
He also said that, while he did not engage in leisure time 
pursuits, he now socialized with other veterans at the local 
Vietnam Veterans organization and attended meetings. He also 
noted that he and his wife had ventured to Gettysburg, 
Pennsylvania, in 2009 for their wedding anniversary. 

Subsequent VAMC treatment records through January 2010 show that 
the Veteran demonstrated essentially the same symptoms as he had 
displayed in previous treatment reports without any appreciable 
increase in the severity of his symptoms. During a November 2009 
primary care visit, the Veteran admitted that he was not 
experiencing any anxiety or depression, and felt that these 
symptoms were being controlled. It was also noted that he had a 
cognitive disorder due to his cardiac arrest. During a December 
2009 visit with his social worker, the Veteran said that his 
major stressors were still the unfinished tasks in the house that 
he and his wife were preparing to sell. Nonetheless, contrary to 
his previous statement during the May 2009 VA examination, he now 
claimed that his psychotropic medication helped to manage his 
angry outbursts and suicidal ideations. He noted that, since his 
health problems were stabilized, he no longer felt that his life 
was threatened. 
 
After a careful review of the complete evidence of record, the 
Board concludes that the preponderance of the evidence is against 
the Veteran's claim for an evaluation in excess of 50 percent for 
PTSD during any portion of the period on appeal. In reaching 
this conclusion, as noted above, the Board observes that, 
although the Veteran's PTSD symptomatology has generally been 
categorized as "severe," based on GAF scores ranging between 45 
and 50, the Board also notes that, while an examiner's 
classification of the level of psychiatric impairment, by words 
or by a GAF score, is to be considered, it is not determinative 
of the percentage rating to be assigned, as the rating depends on 
an evaluation of all the evidence. 38 C.F.R. 
§ 4.126; VAOPGCPREC 10-95. 

In addition, as previously discussed, the rating agency shall 
assign a disability evaluation based on all the evidence of 
record that bears on occupational and social impairment rather 
than solely on the examiner's assessment of the level of 
disability at the moment of the examination. 38 C.F.R. § 4.126 
(2010). In this respect, the Board notes that, although the 
Veteran's symptoms of his PTSD throughout the appeal period have 
clearly been shown to be significant, the symptoms nonetheless 
appear to be more consistent with the current 50 percent rating 
under DC 9411. In this regard, the Board notes that, throughout 
the period on appeal, the Veteran's PTSD has been manifested by 
depression; intrusive thoughts; anger and irritability; 
impairment of short-term memory; emotional avoidance and numbing; 
occasional suicidal ideation; anxiety; occasional panic attacks; 
impaired judgment; difficulty in establishing and maintaining 
effective work and social relationships; and difficulty adapting 
to stressful circumstances (including work or a worklike 
setting). As noted above, symptoms consistent with a 50 percent 
rating include occupational and social impairment with reduced 
reliability and productivity due to such symptoms as flattened 
affect; circumstantial, circumlocutory, or stereotyped speech; 
panic attacks more than once a week; difficulty in understanding 
complex commands; impairment of short and long-term memory (e.g., 
retention of only highly learned material, forgetting to complete 
tasks); impaired judgment; impaired abstract thinking; 
disturbances of motivation and mood; and difficulty in 
establishing and maintaining effective work and social 
relationships. 38 C.F.R. § 4.130, DC 9411 (emphasis added). 

Moreover, despite the findings during the May 2009 VA 
examination, in which the examiner opined that the Veteran's PTSD 
symptoms were "serious," there is no evidence that his 
symptomatology during the period on appeal has ever risen to the 
level of that required for a 70 percent disability evaluation. 
Despite the fact that he has expressed occasional suicidal 
ideation, during the May 2009 VA examination, the Veteran denied 
having any suicidal ideation or plans. Subsequent psychiatric 
treatment reports in November 2009 show that the Veteran admitted 
that he was no longer experiencing any anxiety or depression, and 
felt that these symptoms were being adequately controlled by 
medication. Furthermore, although he has demonstrated difficulty 
in adapting to stressful circumstances (including work or a 
worklike setting), he has never been shown to manifest 
obsessional rituals which interfere with routine activities; 
speech intermittently illogical, obscure, or irrelevant; near-
continuous panic or depression affecting the ability to function 
independently, appropriately and effectively; or spatial 
disorientation. In this respect, the Board observes that, while 
the Veteran was once noted to manifest some difficulty in his 
ability to maintain minimal personal hygiene and other basic 
activities of daily living, as noted by the March 2008 VA 
examiner when he appeared for his examination with mud covering 
his shoes and pants, this appears to have been an isolated 
incident, as there were never any subsequent findings or reports 
that the Veteran had anything less than adequate grooming and 
hygiene. In fact, during the May 2009 examination, the Veteran 
was found to be appropriately dressed and groomed with nothing 
unusual noted about his appearance. In addition, although the 
Veteran has consistently reported having problems with anger and 
unprovoked irritability, during the hearing before the Board, he 
admitted that he had never actually been physically violent. 
Finally, the Board observes that, while the Veteran has had a 
great deal of difficulty in establishing and maintaining 
effective relationships, he has not been completely unable to do 
so. This is clearly demonstrated by the fact that, despite 
reports of frequent marital discord, he has remained married to 
his current wife for over 16 years. Moreover, during the hearing 
before the Board, the Veteran reported that he was attending 
meetings at the local Vietnam Veterans organization.
In addition, a review of the Veteran's symptoms over the course 
of this appeal show that the criteria for a 100 percent 
disability rating have not been met. Specifically, the Veteran 
has not been shown to demonstrate total occupation and social 
impairment, due to such symptoms as: gross impairment in thought 
processes or communication; persistent delusions or 
hallucinations; grossly inappropriate behavior; persistent danger 
of hurting self or others; intermittent inability to perform 
activities of daily living (including maintenance of minimal 
personal hygiene); disorientation to time or place; or memory 
loss for names of close relatives, or own name. 

Accordingly, and based on this evidentiary posture, the Board 
concludes that the symptoms from the Veteran's PTSD are most 
consistent with the currently-assigned 50 percent rating.

Finally, the Board notes that it has also considered the 
potential application of 
38 C.F.R. § 3.321(b)(1), for exceptional cases where schedular 
evaluations are found to be inadequate. See Schafrath v. 
Derwinski, 1 Vet. App. 589 (1991). However, the threshold 
determination is whether the disability picture presented in the 
record is adequately contemplated by the rating schedule. Thun 
v. Shinseki, 
572 F.3d 1366 (Fed. Cir. 2009). In this case, the Board 
concludes that the Veteran's service-connected PTSD is not so 
unusual or exceptional in nature as to render the assigned 
schedular rating inadequate. The Board notes that the rating 
criteria describe the Veteran's symptomatology and higher ratings 
are available for increased levels of disability. The Veteran's 
disability has been evaluated under the applicable diagnostic 
code that has specifically contemplated the level of occupational 
impairment caused by disability. Moreover, there is no evidence 
that his disability has caused marked interference with 
employment or necessitated any frequent periods of 
hospitalization, such that application of the regular schedular 
standards is rendered impracticable. Therefore, referral for 
assignment of an extra-schedular evaluation in this case is not 
in order. Floyd v. Brown, 9 Vet. App. 88, 95 (1996); Bagwell v. 
Brown, 9 Vet. App. 337 (1996).
 
The Board concludes that the preponderance of the evidence is 
against the claim for an evaluation in excess of 50 percent for 
PTSD. The "benefit-of-the-doubt" rule enunciated in 
38 U.S.C.A. § 5107(b) is not for application, as there is not an 
approximate balance of evidence. See generally Gilbert v. 
Derwinski, 1 Vet. App. 49 (1990),; Ortiz v. Principi, 274 F.3d 
1361 (Fed. Cir. 2001). Assignment of staged ratings is not for 
application, as the Veteran's symptomatology during the course of 
this appeal has not been shown to be of greater severity than the 
currently-assigned rating. Hart v. Mansfield, 21 Vet. App. 505 
(2007); Fenderson v. West, 12 Vet. App. 119 (1999).

B. Entitlement to service connection for post-operative 
residuals of ulcerative colitis, to include as secondary to PTSD.

The Veteran contends that his current post-operative residuals of 
ulcerative colitis are the result of his service-connected PTSD. 

As noted above, in order to establish a right to compensation for 
a present disability, a veteran must show: "(1) the existence 
of a present disability; (2) the in-service incurrence or 
aggravation of a disease or injury; and (3) a causal relationship 
between the present disability and the disease or injury incurred 
or aggravated during service"- the so-called "nexus" 
requirement. Shedden v. Principi, supra. 

Service connection may also be established on a secondary basis 
for a disability which is proximately due to, or the result of, a 
service-connected disease or injury. 38 C.F.R. § 3.310(a) 
(2010). The Court has construed this provision as entailing 
"any additional impairment of earning capacity resulting from an 
already service connected condition, regardless of whether or not 
the additional impairment is itself a separate disease or injury 
caused by the service connected condition." Allen v. Brown, 7 
Vet. App. 439, 448 (1995). Establishing service connection on a 
secondary basis essentially requires evidence sufficient to show 
(1) that a current disability exists and (2) that the current 
disability was either (a) caused by or (b) aggravated by a 
service-connected disability. Id; see also Wallin v. West, 11 
Vet. App. 509, 512 (1998).

The Board observes that the provisions of 38 C.F.R. § 3.310 were 
amended, effective October 20, 2006, during the pendency of the 
instant appeal, to conform to the holding in Allen. See 71 Fed. 
Reg. 52744-47 (Sept. 7, 2006). Effective October 10, 2006, the 
section heading of 38 C.F.R. § 3.310 was retitled "Disabilities 
that are proximately due to, or aggravated by, service-connected 
disease or injury," and the text amended to include the 
following paragraph:

(b) Aggravation of nonservice-connected disabilities. 
Any increase in severity of a nonservice-connected 
disease or injury that is proximately due to or the 
result of a service-connected disease or injury, and 
not due to the natural progress of the nonservice-
connected disease, will be service connected. 
However, VA will not concede that a nonservice-
connected disease or injury was aggravated by a 
service-connected disease or injury unless the 
baseline level of severity of the nonservice-
connected disease or injury is established by medical 
evidence created before the onset of aggravation or 
by the earliest medical evidence created at any time 
between the onset of aggravation and the receipt of 
medical evidence establishing the current level of 
severity of the nonservice-connected disease or 
injury. The rating activity will determine the 
baseline and current levels of severity under the 
Schedule for Rating Disabilities (38 CFR part 4) and 
determine the extent of aggravation by deducting the 
baseline level of severity, as well as any increase 
in severity due to the natural progress of the 
disease, from the current level.

See 71 Fed. Reg. 52,744-47 (Sept. 7, 2006). 

The amendment sets a standard by which a claim based on 
aggravation of a non-service-connected disability by a service-
connected one is judged. Although VA has indicated that the 
purpose of the regulation was merely to apply the Court's ruling 
in Allen, it was made clear in the comments to the regulation 
that the changes were intended to place a burden on the claimant 
to establish a pre-aggravation baseline level of disability for 
the non-service-connected disability before an award of service 
connection based on aggravation may be made. This had not been 
VA's practice and thus suggests that the recent change amounts to 
a substantive change in the regulation. For this reason, and as 
the Veteran's claim was pending before the regulatory change was 
made, the Board will consider his claim under the prior version 
of 38 C.F.R. § 3.310, as it is more favorable to the Veteran.

In February 2007, the Veteran was afforded a VA examination 
pursuant to his claim of entitlement to service connection for 
ulcerative colitis. Although he told the examiner that he had 
experienced occasional bouts of diarrhea during service and had 
been told that he had irritable bowel syndrome, there is no 
evidence of a chronic bowel condition during service or a 
diagnosis of a gastrointestinal disorder at service separation. 
Post-service treatment records reveal that the Veteran was 
diagnosed with ulcerative colitis in 1994. After being started 
on a new experimental medication, which proved ineffective, the 
Veteran underwent a total colectomy in December 2004, with an 
ileaoanal anastomosis. The examiner noted that the Veteran had a 
previous diagnosis of PTSD, and said that it was well-documented 
that psychosocial factors contribute to the exacerbation of the 
symptoms of ulcerative colitis. He thus concluded that it was as 
likely as not that his ulcerative colitis symptoms had been 
caused in part by his PTSD. However, he noted that "it is 
difficult to comment without any degree of medical certainty 
regarding how much of the disorder was contributed by PTSD and 
how much was contributed by the ulcerative colitis." Based on 
these findings, the RO denied the Veteran's claim. 
 
Also of record is a November 2004 letter from Dr. Scott E. Plevy, 
Associate Professor of Medicine, Division of Gastroenterology, 
Hepatology and Nutrition at the University of Pittsburgh Medical 
Center. In his letter, Dr. Plevy wrote that the Veteran was 
under his care and was then hospitalized with a severe 
exacerbation of chronic ulcerative colitis. He noted that, 
although the exact causes of this incurable inflammatory disease 
are not completely known, and the disease itself is not caused by 
stress, studies over many decades have demonstrated that, in 
certain patients, stress may exacerbate this condition and create 
flares of the disease. He specifically noted that, in the case 
of the Veteran, his medical history was very typical of this 
phenomenon, in that most of his serious exacerbations of 
ulcerative colitis had occurred during periods of undue stress in 
his life. Dr. Plevy also explained that he was highly qualified 
to comment on the causes and factors involved in ulcerative 
colitis based on his position as an Associate Professor of 
Medicine and Immunology. He further noted that he was Co-
Director of the Inflammatory Bowel Disease Center, and as a 
clinically-trained gastroenterologist, had spent more than a 
decade of his life focused solely on the human inflammatory bowel 
diseases, ulcerative colitis and Crohn's disease. 

It is VA's defined and consistently-applied policy to administer 
the law under a broad interpretation, consistent, however, with 
the facts shown in every case. As previously discussed, if, 
after careful consideration of all procurable and assembled data, 
a reasonable doubt arises regarding service origin, the degree of 
disability, or any other point, such doubt will be resolved in 
favor of the claimant. The Court has stated that "[i]t is clear 
that to deny a claim on its merits, the evidence must 
preponderate against the claim." Alemany v. Brown, 9 Vet. App. 
518, 519 (1996), citing Gilbert v. Derwinski, 1 Vet. App. 49 
(1990). 

Whether a physician provides a basis for his or her medical 
opinion goes to the weight or credibility of the evidence in the 
adjudication of the merits. See Hernandez-Toyens v. West, 11 
Vet. App. 379, 382 (1998). Other factors for assessing the 
probative value of a medical opinion are the physician's access 
to the claims folder and the thoroughness and detail of the 
opinion. See Prejean v. West, 13 Vet. App. 444, 448-49 (2000). 
The probative value of medical opinion evidence is based on the 
medical expert's personal examination of the patient, his 
knowledge and skill in analyzing the data, and his medical 
conclusion. As is true with any piece of evidence, the 
credibility and weight to be attached to these opinions are 
within the province of the adjudicator. Guerrieri v. Brown, 4 
Vet. App. 467, 470-71 (1993). The Board must also make judgments 
as to the credibility of testimony, as well as of various medical 
opinions. In determining whether evidence submitted by a 
claimant is credible, the Board may consider internal 
consistency, facial plausibility, and consistency with other 
evidence submitted on behalf of the claimant. Caluza v. Brown, 7 
Vet. App. 498, 511 (1995). 

Based on a review of the complete evidence of record, the Board 
finds that the medical evidence supports the Veteran's claim of 
entitlement to service connection for post-operative residuals of 
ulcerative colitis as secondarily aggravated by service-connected 
PTSD.

As previously discussed, the Board notes that the February 2007 
VA examiner essentially opined that it was as likely as not that 
the Veteran's ulcerative colitis and post-operative residuals 
were the result of his PTSD, although he also noted that it was 
not entirely clear how much of the disease was caused by PTSD and 
how much was due to a simple manifestation of the disorder 
itself. In this respect, the Board concludes that, although the 
examiner was not able to state with medical certainty the exact 
degree to which the Veteran's disability had been the result of 
PTSD, he nonetheless found that it was at least as likely as not 
caused by the condition. 

In addition, the Board has considered the letter written by Dr. 
Plevy, who clearly explained that, although ulcerative colitis 
itself is not specifically caused by stress, in certain 
individuals, such as the Veteran, stress causes severe 
exacerbations of the disorder. In this respect, the Board notes 
that Dr. Plevy provided clear reasons and bases for his opinion, 
and further noted that, based on his position as an Associate 
Professor of Medicine at the University of Pittsburgh, who had 
extensively studied the bowel system, he felt that he was 
uniquely qualified to opine on this matter. The Board agrees and 
finds this opinion, in addition to that of the VA examiner, to be 
the most probative evidence of record concerning the relationship 
between the Veteran's PTSD and post-operative residuals of 
ulcerative colitis.
 
Consequently, the Board finds that the Veteran's claim of 
entitlement to service connection for post-operative residuals of 
ulcerative colitis has been established on a secondary, 
aggravation basis as a result of his service-connected PTSD. 

ORDER

Entitlement to a rating in excess of 50 percent for PTSD is 
denied.

Entitlement to service connection for post-operative residuals of 
ulcerative colitis, as secondarily aggravated by PTSD, is 
granted.

REMAND

The Veteran contends that his PTSD and post-operative residuals 
of ulcerative colitis result in his total unemployability. After 
a thorough review of the evidence, the Board has determined that 
additional evidentiary development is necessary prior to the 
adjudication of the Veteran's claim.

Entitlement to TDIU was denied in the April 2007 rating decision 
on appeal, and was most recently denied in a June 2009 Statement 
of the Case ("SOC"). A review of the June 2009 SOC, however, 
reveals that the Veteran's service-connected post-operative 
residuals of ulcerative colitis, granted by the Board in this 
decision, were not considered in that adjudication. Accordingly, 
the Board finds this issue to be inextricably intertwined with 
the disability rating yet to be assigned for the Veteran's 
service-connected post-operative residuals of ulcerative colitis. 
See Harris v. Derwinski, 1 Vet. App. 180 (1991) (all issues 
"inextricably intertwined" with an issue certified for appeal 
are to be identified and developed prior to appellate review). 
Therefore, the Board cannot fairly proceed in adjudicating this 
issue until any outstanding matters with regard to the assignment 
of the disability rating have been resolved.

Accordingly, the case is REMANDED for the following action:

The RO/AMC should readjudicate the issue of 
entitlement to TDIU with consideration of all 
service-connected disabilities, to include 
the now service-connected post-operative 
residuals of ulcerative colitis. In so 
doing, the RO/AMC should keep in mind the 
appropriateness of the assignment of "staged 
ratings" under Fenderson v. West, 12 Vet. 
App. 119, 125-26 (1999). If the benefit 
sought on appeal is not granted to the 
Veteran's satisfaction, the Veteran and his 
representative should be provided with a 
Supplemental Statement of the Case and 
afforded the opportunity to respond thereto. 
The matter should then be returned to the 
Board, if in order, for further appellate 
process.

The appellant has the right to submit additional evidence and 
argument on the matter or matters the Board has remanded. 
Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law 
requires that all claims that are remanded by the Board of 
Veterans' Appeals or by the United States Court of Appeals for 
Veterans Claims for additional development or other appropriate 
action must be handled in an expeditious manner. See 38 U.S.C.A. 
§§ 5109B, 7112 (West Supp. 2010).

______________________________________________
BARBARA B. COPELAND
Veterans Law Judge, Board of Veterans' Appeals

 Department of Veterans Affairs